HENRY, J.,
concurring.
I concur fully in the court’s conclusion. I write separately only to note a lingering concern in this case, which although it does not compel another outcome, still gives me pause.
In a slightly different context, but still one involving doing the right thing, the left hand should not know what the right hand is doing. See Matthew 6:8 (King James). Here, unfortunately, it appears the left hand may not know what the left hand is doing. That is, I might be able to understand the BLM and the Forest Service not communicating with each other. But what is difficult is that the Forest Service’s actions suggest that in this matter it did not communicate with itself.
The Forest Service, as an agency of the Department of Agriculture, manages National Forests. In the context of mining, the Forest Service is charged with protecting the surface estate of land owned by the people of the United States through their government. Specifically, the Forest Service must insure that mining “operations ----shall be conducted so as to minimize adverse environmental impacts on National Forest System surface resources.” 36 C.F.R. § 228.1.
In this case we have an obviously fragile ecosystem. In the opening stages of this controversy, the Forest Service made very clear its concerns about mining under streams; indeed, that is why stipulation 9 was made a part of the agreement. Subsidence mining is so named because it— apparently almost always — causes subsidence, which is a rapid sinking of the surface. Of course, where a river is involved, such subsidence causes additional concern to downstream users, and to the surrounding landowners. I am not qualified to analyze, nor do the parties present detailed arguments evaluating the aftereffects of this subsidence on this stream, which, fortunately for this purpose, appears not to involve much water. But, at the outset, the Forest Service was very concerned with subsidence in the stream. As their letter of May 8, 2003, states:
we have concluded that there would be a substantial risk to water flow and the related riparian and aquatic ecosystems in the canyon for portions of the stream channel. The value of these resources is especially prominent considering the current drought.
BLM App. 278 (Letter from Forest Service to BLM, dated May 8, 2003).
Furthermore, the Acting Forest Supervisor
concluded that there [was] insufficient new information and there are too many unknowns regarding the duration of effects to cause further evaluation of the proposal and modify the original decisions document in the ROD.
Id. at 279. However, later in the process the Forest Service seemed to admit that it simply dropped the ball. That is, despite its earlier serious concern about subsidence mining under a stream, the Forest Service concluded that it had not adequately perfected its concern so it was still entitled to object:
As documented in the ROD, it was the intent of the [Forest Service] that consent to the coal lease was conditioned upon restriction of mining operations under the drainage in the East Fork of Box Canyon that would cause subsi *222 dence.... [Tjhose terms were not clearly carried forward in the stipulations attached to the lease that became a contract between the United States and the lessee.
BLM App. 429 (Letter from Forest Service to BLM, dated Jul. 29, 2003). Despite this omission, the Forest Service “share[sj the concerns of the Manti-La-Sal National Forest that subsidence of the area could impact the stream and associated ecosystem.” Id. Given the terms of the lease, the Forest Service had to “recognize that the BLM has the responsibility for administration of federal leases.” Id. at 429-30.
It is difficult to square the earlier concerns with the later action. But, as the plaintiffs did not adequately present their case on appeal, and as the Forest Service did not preserve its ability (and responsibility, it seems) to participate in the final process, we are left with the Office of Surface Mining’s conclusion that the submitted permit revision constituted a mining plan modification within 30 C.F.R. § 746.11(a) and 746.18(d)(6) (requiring a “change in post-mining land use” to prompt Secretarial approval). Our legal conclusion is required; the BLM action is not arbitrary and capricious under these facts. We can only hope that the Office of Surface Mining’s conclusion, made without the benefit of active Forest Service consultation, turns out to be accurate.